UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | D. Kan. Case No. 21-8023 |
| ) | |
| ) | (D.D.C. Case No. 21-218) |
| ) | |
| ) | |
| WILLIAM CHRESTMAN, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM AND ORDER**

### I. INTRODUCTION

This criminal case involves the riot at the United States Capitol on January 6, 2021. The undersigned U.S. Magistrate Judge, James P. O'Hara, conducted a hearing on February 17, 2021, on the government's motion for pretrial detention of defendant William Chrestman, a participant in the riot (ECF No. 1). The government appeared by and through Assistant U.S. Attorney Scott C. Rask. The defendant, who was arrested in Kansas pursuant to a complaint and warrant filed in the District of Columbia, appeared in person and through Assistant Federal Public Defenders Kirk C. Redmond and Chekasha Ramsey.

The stated bases for the government's motion for pretrial detention are as follows:

1. that the defendant poses a serious risk of danger to the community, specifically, by continued violent behavior;

2. that the defendant poses a serious flight risk; and

    3.    that the defendant poses a serious risk of obstruction of justice, specifically, by hiding or destroying incriminating evidence.

Based on the evidence and arguments presented, the court's findings of fact, conclusions of law, and ruling on the issue of pretrial detention are set out below. With obvious grounds for reservation, the government's motion is respectfully denied. However, the defendant's pretrial release will be subject to very stringent conditions, most notably home incarceration with electronic monitoring.

## II.  FACTUAL BACKGROUND

The material facts are set forth in the government's motion (ECF No. 1). They aren't challenged by the defendant's memorandum in opposition (ECF No. 7). Those facts, with one minor correction in the defendant's favor which was made by the government during the detention hearing, are as follows:

> Defendant Chrestman is charged in the District of Columbia by criminal complaint with six counts – Conspiracy (18 U.S.C. § 371); Civil Disorder (18 U.S.C. § 231(a)(3)); Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)); Threatening to Assault a Federal Law Enforcement Officer (18 U.S.C. § 115(a)(1)(B)); Knowingly Entering or Remaining an any Restricted Building or Grounds without Lawful Authority and with a Dangerous Weapon (18 U.S.C. §§ 1752(a)(1) and (2)); 18 U.S.C. § 1752(b)(1)(A)); and Disorderly Conduct on Capitol Grounds (40 U.S.C. §§ 5104(e)(2)(D) and (G)).
>
> …
>
> On January 6, 2021, a mob of rioters descended on the United States Capitol building in Washington, D.C., as part of a concerted effort to prevent a Joint Session of Congress from certifying the Electoral College results and declaring Joseph R. Biden, Jr., to be the 46th President of the United States of America. Whereas some of these rioters traveled to Washington, D.C. individually, a number of extremist and militia groups coordinated together to gather in Washington, expressing in advance their intent to interfere with the Electoral College certification.

One such extremist group was the Proud Boys. Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values. The group has an initiation process for new members, which includes the taking of an "oath." Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.

Beginning as early as December 2020, public communications from Proud Boys organizers encouraged members of the Proud Boys to attend the January 6, 2021 demonstration in Washington, D.C. Such communications included messages sent by the self-described chairman of the Proud Boys, Enrique Tarrio. For example, on December 29, 2020, Tarrio posted a message on the social media site Parler about the demonstration planned for January 6, 2021. Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist… We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows….we might dress in all BLACK for the occasion." The statement about dressing in "all BLACK" is a reference to dressing like the group known as "Antifa," who the Proud Boys have identified as an enemy of their movement and are often depicted in the media wearing all black to demonstrations.

On January 6, 2021, a large group of Proud Boys were captured on publicly-available video marching in a group on Constitution Avenue, Northwest, in the area around First Street, Northwest. The group march was led by, among others, Proud Boys organizers Joseph Biggs and Ethan Nordean, who have both been charged in the District of Columbia by complaint. The group was engaged in various chants and response calls, including "F*** Antifa!" and "Whose streets? Our streets!" Defendant Chrestman was within this group.

Defendant Chrestman was captured on publicly available video recordings interacting with several members of the Proud Boys near the Capitol before it was breached. The same group of Proud Boys were later captured on publicly-available video moving toward the pedestrian entrance to the Capitol grounds on First Street, Northwest. The group continued to be led by Proud Boy organizers Biggs and Nordean.

*Defendant Chrestman's Conduct at the Capitol on January 6, 2021*

Shortly before 1:00 p.m., a large crowd, including a large group of Proud Boys, gathered near the pedestrian entrance to the Capitol grounds on First Street. The entrance was secured by a small number of U.S. Capitol Police, who stood behind a waist-high metal barrier. Shortly thereafter, two men advanced toward the waist-high metal gate. The crowd followed. Defendant Chrestman moved to the front of the crowd during the initial confrontation with law enforcement. A black helmet with a piece of orange tape hung from Defendant Chrestman's backpack. This orange tape is similar in kind and character to the orange tape affixed to the headwear of others, including Felicia Konold, Cory Konold, Christopher Kuehne, and Louis Enrique Colon.

Within minutes, the crowd overwhelmed the U.S. Capitol Police officers. The metal barricades were toppled, and the crowd advanced toward the Capitol. Within minutes, Defendant Chrestman, along with Felicia Konold and Cory Konold, moved past the barrier and placed themselves at or near the front of the crowd at the next police barrier.

As Capitol Police began to form another line closer to the Capitol, Defendant Chrestman was among those at the front of the crowd. Defendant Chrestman stood directly in front of Capitol Police officers who were attempting to guard the Capitol. Defendant Chrestman yelled at the Capitol Police officers, "You shoot and I'll take your fucking ass out!" At a different point, Capitol Police officers attempted to arrest one person from the crowd, and Defendant Chrestman encouraged other members of the crowd to stop the Capitol Police from arresting him. Among other things, Defendant Chrestman said to other members of the crowd, "Don't let them take him!"

The next police line was soon overwhelmed and outflanked by crowds of people as the crowd advanced to the front plaza of the U.S. Capitol. Defendant Chrestman moved to the front of the crowd and stood directly in front of law enforcement officers who were attempting to guard the Capitol. Defendant Chrestman put on the black helmet with orange tape, and he can be seen holding what appears to be a wooden club or axe handle, which had previously included a flag wrapped around it.

Shortly thereafter, Defendant Chrestman removed the black helmet and donned what appears to be a respirator. The helmet with orange tape that had been worn by Defendant Chrestman was then worn briefly by Cory Konold. As depicted in images, Felicia Konold helped Cory Konold put on the helmet.

Video footage taken during the event also captured Defendant Chrestman addressing the crowd of people who had unlawfully assembled on the Capitol grounds. At one point, Defendant Chrestman turned to face the crowd and shouted:

"Whose house is this?" The crowd responded, "Our house!" Defendant Chrestman shouted, "Do you want your house back?" The crowd responded, "Yes!" Defendant Chrestman shouted back, "Take it!"

At another point while outside the Capitol, Defendant Chrestman, Felicia Konold, Cory Konold, and others used their hands and bodies in an effort to disrupt or dismantle the metal barriers that officers were using to control the crowd.

*Defendant Chrestman's Conduct Inside the Capitol on January 6, 2021*

Defendant Chrestman subsequently entered the U.S. Capitol. Video footage obtained from surveillance cameras inside the Capitol, along with open source video, depicts efforts by law enforcement officers to lower metal barriers in the tunnels underneath the Capitol. These metal barriers are designed to seal off areas of the Capitol and were deployed in an effort to control the crowd. U.S. Capitol Police officers were positioned on the other side of the metal barriers, which were being lowered to prevent the crowd from advancing. Defendant Chrestman (along with others) took deliberate steps to prevent the barriers from closing. Defendant Chrestman used the wooden club or axe handle to obstruct the metal barriers.

*Search of Defendant's Residence*

On February 11, 2021, federal law enforcement officers executed a search warrant at Defendant Chrestman's home. Among the items recovered from the search were his cellular telephone. Of note, that phone was found in the dresser drawer of Defendant Chrestman's young child. Items not recovered during the search was any camouflage clothing or tactical gear similar to what Defendant Chrestman wore on January 6, 2021. Additionally, none of Defendant Chrestman's firearms were seen by the agents during the search of the residence [during the detention hearing, the government corrected this to acknowledge that the officers who executed the search warrant saw a 9 millimeter handgun in the defendant's car outside his residence]. Defendant Chrestman has displayed a particular rifle on social media posts several times and the posts give the impression that the firearm has significant meaning to Defendant Chrestman. It is noteworthy that rifle was absent from Defendant Chrestman's home. (Investigating agents learned from one of Defendant Chrestman's associates that after January 6, 2021, Defendant Chrestman asked an associate to keep Defendant Chrestman's firearms.)

ECF No. 1 at 1-6 (footnotes omitted).

The defendant's memorandum in opposition, in addressing the first among the four primary relevant statutory factors addressed in Section IV of this order (focusing on the nature and circumstances of the offenses charged), describes the material facts as follows:

> To prefigure how … [the charged] offenses relate to the likelihood of Mr. Chrestman succeeding on pretrial release, we must start long before January 6.
>
> It is an astounding thing to imagine storming the United States Capitol with sticks and flags and bear spray, arrayed against armed and highly trained law enforcement. Only someone who thought they had an official endorsement would even attempt such a thing. And a Proud Boy who had been paying attention would very much believe he did.
>
> They watched as their "pro-America, pro-capitalism and pro-Trump" rhetorical strategy "allowed the Proud Boys to gain entry into the Republican mainstream." They watched as law enforcement attacked Black Lives Matter and anti-fascism protestors, but escorted Proud Boys and their allies to safety. They watched as their leader, Enrique Tarrio, was named Florida state director of Latinos for Trump. They watched the Trump campaign, "well aware of the organized participation of Proud Boys rallies merging into Trump events. They don't care." They watched when then-President Trump, given an opportunity to disavow the Proud Boys, instead told them to "stand back and stand by." They understood that phrase as "a call to arms and preparedness. It suggests that these groups, who are eager to do violence in any case, have the implicit approval of the state." Having seen enough, the Proud Boys (and many others who heard the same message) acted on January 6.
>
> Their calculations were wrong. The five weeks since January 6 have broken the fever dream. The Proud Boys are "radioactive now." Any "air of respectability is gone." The Proud Boys are in "disarray, as state chapters disavow the group's chairman and leaders bicker in public and in private about what direction to take the Proud Boys in." Their leader was arrested, then "outed as a longtime FBI informant, a role he has now admitted to." And not insubstantially, a number of their members have been arrested for their roles in the January 6 attack.
>
> The government says that "[r]eleasing Defendant Chrestman to rejoin [the Proud Boys'] fold and plan their next attack poses a potentially catastrophic risk of danger to the community." We think that's wrong. The world is a much different place since January 6. The Proud Boys are enfeebled. President Trump is now former president Trump. And Mr. Chrestman has experienced the clarity of

perspective sometimes imparted by a federal prosecution and associated incarceration.

ECF No. 7 at 4-7 (footnotes omitted).

### III. FRAMEWORK FOR ANALYSIS

Of course, the court may not detain a person merely because the charged criminal conduct is reprehensible. Nor may the court detain a person on account of extremist political views. Instead, the court's handling of this case is governed by the Bail Reform Act of 1984. *See* 18 U.S.C. §§ 3141 to 3150. As an analytical starting point, it is critical to keep in mind that the Supreme Court has made abundantly clear that, in our society, liberty is the norm and pretrial detention is the exception to that norm. *See United States v. Salerno*, 481 U.S. 739, 755 (1987). Responding, however, to what Congress perceived to be a "bail crisis in the federal courts" and "the alarming problem of crimes committed by persons on [pretrial] release," the Bail Reform Act was enacted to provide judges the authority to make release decisions that "give appropriate recognition to the danger a person may pose to others if released." *Salerno*, 481 U.S. at 742 (quoting legislative history).

The Bail Reform Act has certain procedural safeguards for the benefit of the accused. For example, the government must prove any claim of dangerousness by clear and convincing evidence. *See* 18 U.S.C. § 3142(f); *United States v. Mobley*, 720 F. App'x 441, 444 (10th Cir. 2017) (citing *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003)). Clear and convincing evidence is evidence that produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions are highly probable.

7

*See Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *United States v. Lutz*, 207 F. Supp. 2d 1247, 1252 (D. Kan. 2002).  However, the government's burden of proof with regard to any claim of risk of flight is only by a preponderance of the evidence.  *See Mobley*, 720 F. App'x at 444 (citing *Cisneros*, 328 F.3d at 616).  Proof beyond a reasonable doubt isn't required in a detention hearing.

The Bail Reform Act calls for a two-step analysis in each case.  *United States v. Ailon-Ailon*, 875 F.3d 1334, 1336 (10th Cir. 2017).  First, the court must determine whether:  (a) the defendant has been charged with any of the types of offenses specified in § 3142(f)(1) of the statute, such as would suggest he poses a danger to the community; (b) the government contends (or the court believes even without any motion by the government) there is a serious risk of flight pending trial; OR (c) the government contends (or the court believes even without any motion by the government) there is a serious risk of obstruction of justice or witness intimidation pending trial.

If any of these three situations exist, then the inquiry turns to the second, much more difficult, step of the analysis.  Since nearly every criminal case theoretically poses *some* risk of flight and danger to the community, the second step examines whether there is *any* combination of conditions that could be placed on the defendant's pretrial release that will *reasonably* assure the appearance of the defendant and assure the community against the danger posed by such release.  *Ailon-Ailon*, 875 F.3d at 1336 (citing 18 U.S.C. § 3142(f)).  Under this step, the court considers four factors specifically set forth in § 3142(g) of the Act: "(1) the nature and circumstances of the offense charged;" "(2) the weight of the evidence against the person;" (3) "the history and characteristics of the person;" and (4)

"the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

## IV. FINDINGS OF FACT AND ANALYSIS

The defendant acknowledged during the detention hearing that he's been charged with one of the five types of offenses set out in § 3142(f)(1) of the Bail Reform Act. That is, the complaint filed against the defendant (along with Christopher Kuehne, Louis Enrique Colon, Cory Konald, and Felicia Konald) in Case No. 21-218 in the District of Columbia on February 10, 2021, includes a felony charge, asserted only against the defendant, of threatening a federal law enforcement officer and of using and carrying a dangerous weapon (an axe handle) during the commission of said offense. *See* 18 U.S.C. § 3142(f)(1)(E). As earlier indicated, the government separately contends that the defendant is a serious flight risk, and further contends that the defendant presents a serious risk of obstructing justice. Therefore, the first step of the pertinent statutory analysis is satisfied.

Turning to the second step of the analysis, in determining whether there are conditions of release that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, the court analyzes the four § 3142(g) factors as follows:

**A.  The nature and circumstances of the offense charged.**  Although things could change when a grand jury convenes in the District of Columbia, the offenses charged in the complaint do *not* involve narcotic drugs, a "crime of violence" (at least as narrowly defined by 18 U.S.C. § 16), terrorism, sex trafficking, firearms, explosives, or destructive

9

devices. *See* 18 U.S.C. 3142(g)(1). Nevertheless, the court cannot and will not turn a blind eye to the fact that the clear intent and result of defendant's violent conduct was to disrupt the peaceful and orderly transition of presidential power for the first time in the United States since the torch passed from President Washington to President Adams 224 years ago. This factor, therefore, weighs heavily in favor of detention.

**B.     The weight of the evidence against the person.** Of course, under the Constitution, the defendant always is presumed innocent in a criminal case. And this constitutionally protected right applies with equal force even to persons whose alleged criminal conduct is vividly recorded and displayed for the world to see. Nevertheless, under the Bail Reform Act, the court must consider the weight of the evidence against the defendant in the context of a detention hearing.

As relates to the Bail Reform Act's weight-of-the-evidence factor, the defendant's memorandum in opposition posits a very interesting argument:

> Convicting "a citizen for exercising a privilege which the State had clearly told him was available to him" violates the Due Process Clause. The former President gave that permission and privilege to the assembled mob on January 6. Trump's incitement and enablement of this insurrectionary riot weighs heavily against the weight of the evidence prong, because the mob was given explicit permission and encouragement by the former President to do what they did. The American head of state directed a specific action; the Due Process Clause says that those who obeyed him have a viable defense against criminal liability.

ECF No. 7 at 11 (footnotes omitted).

The court finds no need to get dragged into the ongoing public debate about whether President Trump can or should be held accountable, criminally or civilly (or perhaps both), for inciting the riot at the Capitol on January 6, 2021. That's for other courts to decide

10

later.  The undersigned magistrate judge has great respect for the professional abilities of defense counsel.  And while a decision on this point presumably will made later on a better-developed set of briefs by the presiding U.S. District Judge in the District of Columbia, it suffices to say today that the undersigned is far from persuaded that the Due Process Clause of the Constitution provides *any* defense to Mr. Chrestman.  That is, this court finds that the record discloses not just a strong, but an overwhelming case on the merits against the defendant.  This court believes his ultimate conviction is highly probable, with a significant prison sentence to follow.

    **C.**    **The general history and characteristics of the defendant,[1] which brings into play a variety of specific sub-factors:**

    **1.**    **The defendant's character.**  In a classic understatement, the defendant's memorandum in opposition candidly acknowledges the obvious --  at the very least, the defendant exhibited "the profound lack of judgment necessary to decide to storm the United States Capitol."  ECF No. 7 at 4.  Beyond that, though, neither party presented anything during the detention hearing from which the court believes it can fairly be inferred that the defendant's character is particularly good or poor.  The court finds this factor is neutral.

    **2.**    **The defendant's mental and physical condition.**  Arguably, one could infer from the defendant's admitted "profound lack of judgment" that he is mentally

---

[1] Before the detention hearing, counsel for the government and for the defendant were provided copies of the report prepared by the court's Pretrial Services officer concerning the defendant's background.  The parties stipulated during the hearing that the court could take judicial notice of the factual information contained in the report.

unstable, or at least extremely stupid and gullible. But there's no direct evidence in the record that the defendant suffers from any significant mental or physical problems. The court finds this factor is neutral.

**3. The defendant's family ties.** The defendant, age 47, reports having little to no contact with either of his parents. He has been divorced since 2012. Evidently, he remains in contact with his three daughters (ages 19, 17, and 6), all of whom live in the Kansas City area (the youngest still resides part-time with the defendant). The defendant's girlfriend of approximately six months resides with him; she currently is unemployed, but has no criminal history. The court finds this factor weighs in favor of pretrial release.

**4. The defendant's employment situation.** The defendant served in the U.S. Army from 1992 until 1996 when he was honorably discharged. He has been unemployed for nearly one year, after getting laid off. Before that he was regularly employed for fourteen years. He reports that he was actively looking for employment at the time of his arrest. He also reports having applied for benefits through the Veterans Administration because he's considered 40% disabled. This factor weighs in favor of pretrial release.

**5. The defendant's financial resources.** The defendant, though not impoverished, is a person of limited financial means. He reports having little equity in the home he owns, but that hasn't been verified. In any event, there's nothing in the record suggesting he has much in the way of accumulated financial resources, and therefore he doesn't appear to have way to finance flight from the jurisdiction for any extended period of time. On the other hand, it could be inferred that the defendant would stand to lose very

little if he were to flee before trial. The court declines to draw that inference in this particular case. This court finds this factor is neutral.

**6. The defendant's length of residence in the community and his community ties.** The defendant has resided in the Kansas City area for seventeen years. However, apart from what already has been described with regard to family ties and employment, there's nothing in the record to suggest meaningful community ties, such as particularly close relationships with friends or neighbors, regular participation in a particular form of recreation with other persons, involvement in school or civic groups, holding of public office, membership and some semblance of regular attendance at a house of worship, or anything similar to the foregoing. The court finds this factor is neutral.

**7. The defendant's past conduct.** Other than what will be addressed separately below in connection with the defendant's criminal record, nothing specific has been presented that would allow a reasonable inference that the defendant's prior conduct has been particularly good or poor. The court finds this factor is neutral.

**8. The defendant's history, if any, relating to drug or alcohol abuse.** There is no evidence in the record of drug or alcohol abuse. The court finds this factor weighs in favor of pretrial release.

**9. The defendant's criminal history.** As summarized in the Pretrial Services Report, the defendant has no significant criminal history. The court finds this factor weighs in favor of pretrial release.

**10. The defendant's record concerning appearance at court proceedings.** It follows from the defendant's lack of significant criminal history that

there's no demonstrated record of failing to appear as required for criminal cases. The court finds this factor weighs in favor of pretrial release.

As mentioned earlier, the ten specific sub-factors reviewed immediately above relate to the general history and characteristics of the particular defendant. On balance, in the court's view, this general factor weighs in favor of pretrial release.

**D.     The nature and seriousness of the danger to any other particular person, or the community at large, that allegedly would be posed by the defendant's release pending trial.** In the abstract, the threat of continued riotous conduct by the defendant if he were released obviously presents an extremely serious danger to the community, most notably to those public officials who have been duly elected despite the defendant's apparently strong views to the contrary. Nevertheless, whether for tactical reasons or otherwise, the government has not proffered, let alone proven by clear and convincing evidence, that the defendant engaged in any criminal conduct *before* January 6, 2021, individually or in concert with the Proud Boys. Nor has the government proffered or proven by clear and convincing evidence that *after* January 6, 2021, the defendant engaged in any criminal conduct, other than arguing he must have hidden or destroyed incriminating evidence before his home was searched on February 11, 2021. Balancing the extreme risk in the abstract against the absence of any proven risk, the court finds this factor is neutral.

## V.  CONCLUSION

The court has weighed and balanced all of the various relevant factors. Of course, this exercise is not as simple as counting those factors that weigh in favor of release against

those that weigh in favor of detention. Each case calls for individualized analysis. This case presents a very close call.

The government contends the defendant poses a serious flight risk, not so much in terms of physically leaving the jurisdiction, but rather because his conduct on January 6, 2021, indicates he is not reasonably amenable to any conditions of supervision the court might set while he remains in the jurisdiction. The court shares the government concerns. However, given the record as a whole, despite the defendant's utterly despicable conduct on the date in question, the court finds the government has failed to prove its contention in this regard by a preponderance of the evidence.

The evidence lends to an inference that the defendant probably did destroy or hide incriminating evidence before the government got a warrant to search his home. And thus the government contends he poses a serious risk of further obstructive conduct if released. Here again, the court shares the government's concerns. But given the overwhelming video evidence the government already has in its possession, the defendant is correct in pointing out that, as a practical matter, it's difficult to conceive of what additional evidence the government needs at this point. In any event, the court finds the government has failed to prove by clear and convincing evidence that regardless of what conditions might be set the defendant poses a risk of further obstructing justice. For the reasons already explained in Section IV(D) of this order, the court likewise finds that the government has failed to prove by clear and convincing evidence that, if released, the defendant is likely to engage in further conduct of the sort that occurred at the Capitol on January 6, 2021.

The bottom line is that the court believes *very* stringent conditions on the defendant's release, as set out in Section VI below, can and will reasonably assure against the risks of flight, danger to the community at large, and obstruction of justice. The court has considered all of the various combinations of possible conditions of release which are mentioned in the Bail Reform Act.[2]

## VI. ORDER

The government's motion for pretrial detention is denied. The defendant shall be placed on pretrial released, but subject to many conditions, most notably home incarceration with electronic monitoring.

*Provided* the defendant (personally or through counsel) signs the proposed order setting conditions attached as Exhibit 1, *and further provided* he posts the cash bond attached as Exhibit 2 (using most of the $10,500 that defendant has said during his initial

---

[2] Under 18 U.S.C. § 3142(c), although not set forth in any order of preference, the conditions of release may include:
1. third party custody;
2. maintaining or seeking employment;
3. maintaining or commencing an educational program;
4. restrictions on travel, personal associations, or place of abode;
5. prohibition against contact with alleged violent or potential witness;
6. regular reporting to a designated law enforcement officer;
7. curfew;
8. prohibition on possession of dangerous weapons;
9. restrictions on use of alcohol or controlled substances;
10. medical or psychiatric treatment;
11. agreements to forfeit money or property upon failure to appear;
12. surety bond;
13. confinement with part-time release; or
14. any other condition reasonably necessary to assure the defendant's appearance and the safety of the community or other persons.

appearance was in his safe at home), he shall be released from temporary detention. However, *before* the defendant is released from the CoreCivic detention facility, the Pretrial Services Office must verify that all firearms have been removed from the defendant's home and from any motor vehicles parked at or immediately adjacent to the defendant's residence. In addition, once the defendant is released from the detention facility, he shall go directly and immediately to the Pretrial Services Office in Kansas City, Kansas, to be outfitted for electronic monitoring.

IT IS SO ORDERED.

Dated February 19, 2021, at Kansas City, Kansas.

 s/ James P. O'Hara
James P. O'Hara
U. S. Magistrate Judge