```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
 2
     UNITED STATES OF AMERICA,          Docket No. 21-mj-8023-TJJ
 3
        Plaintiff,                      Kansas City, Kansas
 4                                      Date: 2/17/2021
          v.
 5
     WILLIAM CHRESTMAN,
 6
        Defendant.
 7      ...................

 8                           TRANSCRIPT OF
                           DETENTION HEARING
 9              BEFORE THE HONORABLE JAMES P O'HARA,
                   UNITED STATES MAGISTRATE JUDGE.
10
     APPEARANCES:
11
     For the Plaintiff:      Scott Rask & Chris Oakley
12                           Asst US Attorneys
                             360 US Courthouse
13                           500 State Avenue
                             Kansas City, KS  66101
14
     For the Defendant:      Che Ramsey
15                           Asst Federal Public Defender
                             201 US Courthouse
16                           500 State Avenue
                             Kansas City, KS  66101
17
                             Kirk Redmond
18                           Asst Federal Public Defender
                             117 SW 6th Street
19                           Suite 200
                             Topeka, KS  66603
20
     Court Reporter:         Nancy Moroney Wiss, CSR, RMR, FCRR
21                           Official Court Reporter
                             558 US Courthouse
22                           500 State Avenue
                             Kansas City, KS  66101
23
     Proceedings recorded by machine shorthand, transcript
24   produced by computer-aided transcription.

25
```

1          THE COURT:  At this time court calls the criminal case

2    styled United States versus William Chrestman here in the

3    United States District Court for the District of Kansas.  This

4    is Case Number 21-8023.  It corresponds in United States

5    District Court for the District of Columbia to Case

6    Number 21-218.  May I please have the appearances of counsel?

7          MR. RASK:  May it please the court, the United States

8    appears by Scott Rask and Chris Oakley.

9          MS. RAMSEY:  Good morning, Your Honor.  Che Ramsey and

10   Kirk Redmond on behalf of William Chrestman who appears in

11   person.

12         THE COURT:  The record should reflect that we're

13   convening today, or at least it is scheduled for a preliminary

14   and a detention hearing as relates to the complaint filed in

15   the District of Columbia.  Counsel, it's my understanding from

16   e-mail traffic that was shared with chambers that the parties

17   are agreeable to postponing any preliminary hearing until some

18   date on or after February 25th, is that correct?

19         MR. RASK:  Yes, that is our request, and it is not

20   objected to.

21         THE COURT:  Is that correct, Miss Ramsey?

22         MS. RAMSEY:  That's correct, Your Honor.

23         THE COURT:  Is it anticipated that this case will be

24   presented to a grand jury in the District of Columbia sometime

25   between now and February 25th?

1          MR. RASK:  That is a distinct possibility, yes, Your

2     Honor.

3          THE COURT:  Okay.  I notice that we have a number of

4     people in the courtroom.  Whether they be members of the press

5     or otherwise, I do want to advise everybody that proceedings in

6     this court may not be recorded or otherwise broadcast for

7     public dissemination.  The court may impose sanctions on anyone

8     violating this prohibition to the maximum extent allowed.  So,

9     to be more blunt or direct about it, if anybody's got a

10    recording device of any kind on them turned on, whether it be a

11    phone or otherwise, it ought to be turned off immediately.

12    Counsel, as relates to the detention hearing today, are there

13    any objections by either side to the court taking judicial

14    notice of the factual information in the pretrial services

15    report, putting aside the ultimate recommendation?

16         MR. RASK:  No objection, Your Honor.

17         MS. RAMSEY:  No objection.

18         THE COURT:  Very well.  The court will note those

19    facts judicially.  I do note that in addition to the

20    government's detailed written motion for detention and the

21    defense's opposition memorandum, both of which have been

22    reviewed, has anything else been filed, specifically a reply

23    brief at this point?

24         MR. RASK:  No, Your Honor.

25         THE COURT:  Okay.  Miss Ramsey, as relates to the

1    asserted bases for the government's motion for detention, is

2    there any dispute by the defendant as to the government's

3    entitlement to seek detention based on dangerousness, given the

4    nature of the specific crimes charged against Mr. Chrestman?

5           MS. RAMSEY:  No, Your Honor.

6           THE COURT:  Very well.  Does either side intend to

7    present live testimony today, or will be presenting on a

8    proffer?

9           MR. RASK:  By proffer, Your Honor.

10          THE COURT:  Same for the defense?

11          MS. RAMSEY:  Yes, Your Honor.

12          THE COURT:  Okay.  At the initial appearance last

13    week, I believe I commented in visiting with Mr. Chrestman that

14    a rebuttable presumption of detention might apply or would

15    apply in this case.  Upon further review, at least my sense is

16    that a rebuttable presumption does not apply given the nature

17    of the crimes at least currently charged.  Do you agree with

18    that, Mr. Rask?

19          MR. RASK:  Yes, Your Honor.

20          THE COURT:  And I presume you do as well, Miss Ramsey?

21          MS. RAMSEY:  Yes, Your Honor.

22          THE COURT:  Very well.  Mr. Rask, you may proceed.

23          MR. RASK:  Thank you.  May I go up to the lectern?

24          THE COURT:  Please.  Go ahead, Mr. Rask.

25          MR. RASK:  Thank you, Judge.  Initially, I need to

1    make some corrections or clarification to some of the

2    information in our motion that we filed on February 12th.

3    Specifically, beginning on Page 6, there's a section titled

4    search of defendant's residence, and we have a sentence in

5    there about halfway through; additionally, none of defendant

6    Chrestman's firearms were seen by the agents during the search

7    of the residence.  We need to correct that to say there was a

8    9-millimeter in a vehicle that the agents saw.  They did not

9    seize that gun, but they did see that.  I would just also add

10   by way of clarification, there were several gun boxes as well

11   as a gun safe that were found, and no firearms were found in

12   any of the boxes or in the gun safe, and those were located in

13   the residence.

14           THE COURT:  Was the 9-millimeter firearm in the car

15   not seized because of a lack of a warrant for the car?

16           MR. RASK:  No, it was not seized just as it was not

17   evidence that was being sought under the search warrant that

18   was obtained, Your Honor.

19           THE COURT:  Very well.

20           MR. RASK:  Then on Page 8, carrying over to Page 9,

21   with respect to Sub-section B, weight of the evidence,

22   references in that sentence that carries over similarly, when

23   agents surveilled defendant Chrestman's home on January 19th,

24   2021, they noted the numbers for his address displayed on the

25   home.  There is a lack of certainty as to whether or not the

1    numbers were seen on January 19th of 2021.  So, the way in

2    which that reads, that with certainty, a law enforcement agent

3    or officer saw those numbers, that is not certain at this

4    point, Your Honor.

5         THE COURT:  I'm not sure I'm understanding what you're

6    trying to communicate.  Had the agents seen the numbers on the

7    defendant's home on some date prior to January 19th?

8         MR. RASK:  No, Your Honor.

9         THE COURT:  Okay.

10        MR. RASK:  And then in the next page, on Page 9, in

11   Section C, the defendant's history and characteristics weigh in

12   favor of detention, that first sentence references criminal

13   record is limited with drug trafficking activity.  For some

14   reason, when I read the print-out, I saw dangerous in an

15   abbreviation for weapon, and my mind went to drugs instead of

16   dangerous weapon.  So, the pretrial services report is correct

17   in noting the dangerous weapon incident, and I was incorrect

18   when I wrote that in here, Your Honor.

19        THE COURT:  Thank you, Mr. Rask.

20        MR. RASK:  Judge, apart from those corrections,

21   clarification, we do have Task Force Officer Vince Kingston who

22   would be here -- who is here who could answer questions with

23   respect to the facts contained in the detention motion as well

24   as his personal review of the surveillance video and other

25   video that's identified, the still images of which are -- some

1  of which are contained in the complaint that was filed in the

2  District of Columbia, and so, there's some firsthand knowledge,

3  if you will, of reviewing that video and matching that up to

4  the defendant.  We would also ask the court to take judicial

5  notice of the complaint that was obtained in the District of

6  Columbia that spells out -- in the affidavit that spells out

7  the facts supporting the charges against the defendant.

8            THE COURT:  Any objection, Miss Ramsey?

9            MS. RAMSEY:  Yes, Your Honor, I -- I think that the

10 court could take judicial notice of an indictment, but to the

11 extent that it's a complaint and a preliminary hearing still

12 has to be had, I don't think the court can take judicial

13 notice.

14           THE COURT:  Well, if the complaint was referred to,

15 it's technically hearsay, but the rules of evidence

16 specifically contemplate that hearsay is admissible in the

17 detention hearing, but -- so, what would be the -- the problem

18 with the court simply considering the information in the

19 complaint that had been tendered?

20           MS. RAMSEY:  I don't know that there's an issue with

21 the court considering the information.  I just -- I'm trying to

22 contemplate the court taking judicial notice of information

23 although it contains hearsay.  However, a probable cause

24 finding would be made, but I would leave it up to the court.

25           THE COURT:  Okay.  Well, to be clear, I don't intend

1    to deem the facts that are set forth in the complaint to be

2    conclusively established in the sense of that sort of judicial

3    notice.  I simply intend to -- based on Mr. Rask's proffer --

4    to consider the information in the complaint along with any

5    other information that either side presents.

6           MS. RAMSEY:  Understood, Your Honor.

7           THE COURT:  Okay.  Go ahead, Mr. Rask.

8           MR. RASK:  Your Honor, there's no other factual

9    information that we would proffer at this time.

10          THE COURT:  Okay.  Does the defense wish to proffer

11    any information factually?

12          MS. RAMSEY:  Regarding the evidence, Your Honor?

13          THE COURT:  Yes.

14          MS. RAMSEY:  Just briefly, Your Honor.  We understand

15    that the -- the government has made some corrections.  We would

16    proffer evidence specifically as to the information given to

17    the court as far as evidence that it's our understanding when

18    we have interviewed individuals in his family, that we were

19    informed that the issue with the numbers on the house, that the

20    numbers had been previously moved as a result of the house

21    being painted far in advance of the January 6th event, and

22    particularly far in advance to January 19th, and just had never

23    been put back up.  So, we would proffer that information as

24    evidence.  Outside of that, we would have other information for

25    the court regarding 3142 D factors that we would make known to

1    the court, but outside of the information I gave about

2    evidence, that's what we have.

3         THE COURT:  Okay.  Very well.  I think we're back to

4    you, Mr. Rask, for argument.

5         MR. RASK:  Thank you, Judge.  We continue with our

6    position that the defendant should be detained, and the basis

7    of that remains the same as what was in our motion that was

8    filed on the 12th.  With respect to some of the specific

9    factors and information from the pretrial services report, some

10   of that information would certainly suggest a less strident

11   view than what the -- what the government had in its initial

12   position with the filing this motion, such as the length of

13   time he's been in the community, and some of those other facts

14   and information that a court normally considers.  But in some

15   respects, that stability and those other positive aspects of

16   that makes the defendant's actions all the more weighty or

17   serious in considering what the defendant did at the Capitol

18   grounds and in the Capitol itself.  Would certainly be

19   completely opposite of someone who otherwise seems to be a -- a

20   solid member of -- of the community, and so, from that

21   standpoint, it just seems as though there are stronger factors

22   that would -- or stronger inferences that should be drawn that

23   the danger posed by the defendant, despite the stability, the

24   employment, and some of the other background that the pretrial

25   services report has identified.  Furthermore, with respect to

1    the weight of the evidence against him, some could read the

2    response as not quite an admission to the actions, but

3    certainly not challenging some of the evidence against the

4    defendant with respect to the images and the video that exists

5    against him, but that the actions were taken for a justifiable

6    reason.  I don't know that that is an appropriate argument to

7    be made or to be considered with respect to the issue of

8    detention and dangerousness, because that would be more of

9    whether that's an appropriate legal argument that could be

10   presented at the time of a jury trial in this case.  And then

11   finally, with respect to the absence of tactical gear, the

12   absence of camouflage, the absence of a particular firearm with

13   connections to the Proud Boys, those sorts of specific actions

14   taken by the defendant, as we argue in the motion, would

15   suggest that there was deliberate efforts taken to distance

16   himself from the criminal activity, things that were done to

17   obstruct the investigation that was under way.  And so, for

18   those reasons, I think that detention is most appropriate in

19   this case.  I'm happy to answer any questions the court may

20   have.

21          THE COURT:  I think I want to hear argument from the

22   defense first, but I have questions of both sides, rest

23   assured.  Miss Ramsey?

24          MS. RAMSEY:  One moment, Your Honor.

25          THE COURT:  Sure.

1           MS. RAMSEY:  Thank you.  Your Honor, I will tell the

2   court we're going to take this in two parts.  I'd like to just

3   proffer some information about Mr. Chrestman to the court, and

4   then Mr. Redmond will give the court argument.  You know, Mr.

5   Chrestman was originally born in California.  He completed high

6   school there, went to a few years of junior college.  He then

7   entered the Army where he served four years as an Army medic,

8   private class.  He received an honorable discharge after

9   serving those four years.  After the Army, I believe he worked

10  some temporary positions/jobs.  A couple of those were in group

11  homes for troubled teens, and then he began working at the

12  Sheet Metal Union Local Two in Kansas City, Missouri.  That was

13  after his arrival here in Kansas, which what brought him here

14  was a marriage and the idea that he could provide stability and

15  buy a home for his family.

16          THE COURT:  Excuse me, counsel, could you stand a

17  little bit more closely to the microphone?

18          MS. RAMSEY:  Close to the mic?  I'm trying to get as

19  close as I can.  Can you hear me now?

20          THE COURT:  Go ahead.

21          MS. RAMSEY:  He did buy a house.  He has lived at the

22  same residence since 2004.  He made a life and a family here,

23  and by all accounts, his family is here supporting him today in

24  the courtroom.  He is a family man.  At this time, he actually

25  shares custody of and spends time with his six-year old

1    daughter part-time, and he cares deeply about his children, and

2    it's been the first priority in his life.  He currently -- in

3    addition to those ties, he is currently in a relationship

4    with what he deems -- he calls his wife -- they had a ceremony,

5    but his long-term girlfriend.  The other points in considering

6    the factors -- other factors the court is supposed to consider,

7    as the court has seen in the bond report, taken judicial

8    notice, is a man with no mental health issues.  He's not a drug

9    user.  He has no criminal history really except for two

10   speeding tickets.  Regarding flight, I mean, he doesn't even

11   have a passport.  There's no history that he's ever missed any

12   court appearances.  Nothing in his history and characteristics

13   suggest that he is a flight risk, a danger to the community or

14   an attempt to obstruct justice.  We've given the court the

15   information about not only in taking consideration the

16   corrections by the government in their motion, but about the

17   numbers in the house.  I think it is important for the court to

18   know second, that on -- on or about January 27th, I received a

19   call from an attorney asking about Mr. Chrestman to contact our

20   office for purposes of representation.  Mr. Chrestman did

21   contact our office requesting advice and counsel based on media

22   reports and information seen that he possibly could be supposed

23   under investigation.  At that time, being unaware of any open

24   investigation, I gave him appropriate advice, but we were

25   unable to represent him as he had not been contacted by law

1    enforcement.  But I will tell the court that he did call asking

2    regarding whether to turn himself in.  He again contacted our

3    office I believe around February 4th with the same information,

4    but again, no contact by law enforcement had been made, and he

5    was given the direct number to call our office once the -- that

6    may have occurred.  So, I think the court -- it's important for

7    the court to know the information, that he was seeking and had

8    supposed that he had may be under investigation, and what to do

9    at that point, and did not take flight.  Your Honor, we proffer

10   all of this information which has been verified by pretrial

11   services.  If the court has any issue with the proffer, we do

12   have a witness here we can present.  So, unless the court has

13   questions about either the facts as verified by probation and

14   pretrial in the report or the information I've given the court

15   here, I believe I'm going to leave it up to Mr. Redmond to make

16   further argument regarding our point.

17            THE COURT:  Thank you, Miss Ramsey.  Mr. Redmond,

18   you're up.

19            MR. REDMOND:  Your Honor, I have just some brief

20   responses to the government's arguments, but from at least my

21   perspective, I think it makes more sense to start with the

22   court's questions, if that's okay.

23            THE COURT:  Okay.  Let's go back to Mr. Rask, then.

24            MR. REDMOND:  Okay.

25            THE COURT:  Mr. Rask, by media accounts at least,

1    there were hundreds if not thousands of folks that stormed the

2    Capitol on January 6th with Mr. Chrestman.  It's my

3    understanding from the papers you've submitted that many of

4    those folks have been charged in federal court.  Can you share

5    with me whether detailed, reasoned, written detention decisions

6    have been made in other cases, and how would those inform a

7    decision in the present case?

8              MR. RASK:  Yes, Judge.  My understanding from talking

9    with my colleagues in the District of Columbia is that they are

10   seeking to be deliberate in deciding which defendants should --

11   detention should be sought.  Specifically, with -- with this

12   particular case, the five individuals that were charged in this

13   complaint, Mr. Chrestman is the only one for which detention is

14   being sought, and was being -- was sought, and that had to do

15   with more the leadership role that he played, as well as the

16   more forceful way in which he engaged in activity on the

17   Capitol grounds and within the Capitol on January 6th.  And

18   from my conversations with those colleagues in DC, those are

19   the types of factors and information they're taking into

20   account, as well as some of those who may have criminal history

21   or some of the other more traditional detention things that

22   courts encounter.

23             THE COURT:  And are there reported detention decisions

24   that I might consult in making my decision that you're aware

25   of?

1          MR. RASK:  I don't have a list.  My understanding is

2   that -- and I don't know if there have been what -- to what

3   extent some of the detention orders have been written as far as

4   the reason, but my understanding is that the chief judge in the

5   District of Columbia has handled a number of review hearings

6   for cases that have gone back to the district.

7          THE COURT:  Chief District Judge in the District of

8   Columbia, correct?

9          MR. RASK:  Yes, Judge.

10          THE COURT:  And how have those review decisions come

11   out?

12          MR. RASK:  My -- and I've not read those, but my

13   understanding is that the majority of those have determined

14   that detention is appropriate.

15          THE COURT:  Okay.  Who -- refresh my memory, who is

16   the chief judge in the District of Columbia these days?

17          MR. RASK:  I don't know that I was given that

18   information, Judge.

19          THE COURT:  Would it be fair to assume that there is

20   an Assistant United States Attorney in the District of Columbia

21   who's coordinating this prosecution?

22          MR. RASK:  Yes, Judge.

23          THE COURT:  Could you check with that individual and

24   maybe share that information in terms of what decisions have

25   been made, and what differentiating factors have been

1    considered relevant by that, since it's possible at least, if

2    not probable, that depending on how I decide -- well, one thing

3    I'm positive of, no matter how I decide, somebody's going to be

4    upset, and somebody's going to appeal, and the chief judge in

5    the District of Columbia sounds like the person who's going to

6    review my homework.  So, I'd like to see that person's views on

7    this matter before I make a decision.

8            MR. RASK:  Yes, Judge.

9            THE COURT:  Okay.  On Page 2 of your motion, Mr. Rask,

10   it states in pertinent part that a number of extremist and

11   militia groups coordinated together to gather in Washington

12   expressing in advance their intent to interfere with the

13   Electoral College certification.  What evidence if any are you

14   in a position to talk to today as to Mr. Chrestman's

15   participation in that alleged coordination?

16           MR. RASK:  Judge, apart from his decision to travel to

17   DC, I don't have any specific information on that point.

18           THE COURT:  Okay.  I mean, you have talked about what

19   efforts you construe as coordination on the scene, but am I

20   correct in understanding you don't have any information about

21   what preparations he made before he got to Washington, at least

22   at this point?

23           MR. RASK:  Yes, Your Honor.

24           THE COURT:  Going back to this issue of prior

25   detention decisions, on Page 3 of your motion, there's a

1    reference to the march on the date in question being lead by

2    Proud Boys' organizers Joseph Biggs and Ethan Nordean.  Have

3    those folks been detained?

4         MR. RASK:  Judge, I don't want to misspeak, but I

5    think Mr. Nordean was, 'cause I remember discussing that, but

6    again, I can verify that.

7         THE COURT:  Okay.  Mr. Rask, with regard to the

8    defendant's personal history and characteristics as described

9    on Page 9 of your motion, would you acknowledge that but for

10   Mr. Chrestman's conduct on the date in question, that factor in

11   this case would weigh in his favor for release?

12        MR. RASK:  Absolutely, yes, Your Honor.

13        THE COURT:  And do you have any dispute about the fact

14   that the case law in this area suggests that the personal

15   history and characteristics would be the most important before

16   statutory factors?

17        MR. RASK:  Yes, Your Honor.

18        THE COURT:  Maybe my question was unclear.  Do you

19   agree that under the case law, the personal history and

20   characteristics is the most important among the four statutory

21   factors?

22        MR. RASK:  Yes, Your Honor.

23        THE COURT:  Okay.  Is the government in a position to

24   proffer any evidence about efforts made by Mr. Chrestman after

25   January 6th to commit violent acts or disrupt public

1    proceedings, anything of that sort?

2              MR. RASK:  I have no information about that, Your

3    Honor.

4              THE COURT:  Mr. Rask, in the opposition memorandum

5    filed by defense counsel, it seems to be suggested that the

6    events of January 6th have made members of the Proud Boys,

7    including Mr. Chrestman, realize that maybe storming the

8    Capitol wasn't such a good idea.  What evidence are you in a

9    position to proffer about efforts made by the Proud Boys as a

10   group to commit criminal acts subsequent to those of

11   January 6th?

12             MR. RASK:  I don't have any information to identify

13   such acts, Your Honor.

14             THE COURT:  I mean, does the government still consider

15   the Proud Boys an active right wing extreme group?

16             MR. RASK:  I don't know that I'm wholly qualified to

17   speak to that, but I do think that there remain concerns about

18   the Proud Boys and their intentions and the reasons for which

19   they exist, but whether or not those manifest themselves in

20   other violent activity, I -- I can't speak to that.

21             THE COURT:  Let me ask you this.  Let's assume for the

22   sake of discussion only that I were ultimately to conclude that

23   release as opposed to detention is appropriate, and let's

24   further assume that those conditions of release would include

25   not just those proposed by pretrial services, but also home

1    detention with the understanding that Mr. Chrestman could not

2    leave his home for any of the customary things such as doctor

3    visits, church, attorney visits or otherwise unless he had an

4    advance written permission from the pretrial services officer.

5    Do you believe that would be enough to assure against both

6    danger to the community and flight risk, provided that it was

7    accompanied by electronic monitoring, and if not, why not?

8            MR. RASK:  Judge, on behalf of my colleagues in the

9    District of Columbia, I don't think they would view that to be

10    sufficient.

11            THE COURT:  Okay.  I hear your pain and I understand

12    your position.  Okay.  Thank you, Mr. Rask.  I appreciate your

13    candor.  Mr. Redmond, I have some questions of the defense, if

14    I may.

15            MR. REDMOND:  Yes, Your Honor.

16            THE COURT:  And I want to be clear not to ask you for

17    any privileged information, and if I inadvertently frame my

18    question in a way that you think is problematic, let me know,

19    but has Mr. Chrestman been provided a copy of the brief that

20    you filed on his behalf?

21            MR. REDMOND:  Yes.  He has only received a copy today,

22    but yes, and we discussed the contents with him.

23            THE COURT:  Has he read it?

24            MR. REDMOND:  Can I confer with him to make sure?

25            THE COURT:  Please.  And I guess the follow-up

1    question I have is, does he stand by everything you say in this

2    document?

3            MR. REDMOND:  He has not read the whole thing, but

4    if -- I'm happy to confer with him as to the particular topic

5    that you're interested in.

6            THE COURT:  The reason I ask is there is -- there is

7    -- and maybe this is the art of advocacy, maybe it's something

8    else, but there are various explanations that are advanced on

9    behalf of the defendant here that strike me as aspirational

10   more than realistic.  I mean, a fair reading of this document

11   would suggest that the events of January 6th have left Mr.

12   Chrestman -- this is your term -- chastened, not emboldened,

13   and that he probably realizes this was not a really good idea.

14   That be a fair statement?

15           MR. REDMOND:  It is.

16           THE COURT:  Okay.  And as I read this, basically, the

17   defense is -- of Mr. Chrestman and the Proud Boys is President

18   Trump told me to do this, and therefore, I thought I could do

19   it, and therefore, I did it.  That be a fair statement.

20           MR. REDMOND:  No.  So, the -- those arguments occur in

21   two different contexts.  The first is whether there's the

22   availability of the defense under the due process clause, and I

23   don't pretend that any of the case law we've cited is on all

24   fours with a violent insurrection that was according to a lot

25   of people incited by the president.  I expect there will be

1    quite a bit of law on that particular point sometime in the

2    next year and a half, but it's just to point out that, hey,

3    there is technically the possibility of a defense.  In terms of

4    how we --

5         THE COURT:  Let's -- before we leave that, I guess

6    that is a major concern I have.  If basically what you're

7    saying is, under the due process clause, Mr. Chrestman would

8    have a defense to all of the charges against him in this case

9    because the highest executive officer of the land basically

10   said go to the Capitol.

11        MR. REDMOND:  That is a possibility, yes.

12        THE COURT:  Okay.  So, if that's a defense, and

13   specifically involving the president of the United States, how

14   does that square with the fact that several, perhaps more than

15   a dozen folks that were reporting directly to President Nixon

16   went to jail for the events surrounding the Watergate episode?

17        MR. REDMOND:  So, the -- that is an excellent

18   question.  I don't -- I'm not as familiar with Watergate as I

19   should be.  I mean, I understand the subsequent prosecution.

20   Maybe they just didn't raise my defense, but I think that more

21   generally, the question will filter through these cases not

22   only in terms of whether or not there is a complete defense,

23   but also whether that has a mitigating effect, but I mean, you

24   know, the portions that we're citing in the brief about what

25   Donald Trump said and did, we take a fairly clear position that

1   we think he has a lot of responsibility for this, but our
2   larger point is not that.  It is that this world has changed so
3   dramatically since January 6th for people in Mr. Chrestman's
4   position, that we're -- it's not that we're putting the entire
5   thing at the feet of Donald Trump.  It's that Donald Trump is
6   gone, and such a scenario reappearing seems to us highly
7   unlikely.  And to the court's question about chastened, not
8   emboldened, I think that that observation is drawn from our
9   conversations with Mr. Chrestman, and as Miss Ramsey proffered,
10  if he is released on bond, what he'd like to do is take care of
11  his family.  He needs to fix up the house.  He recognizes that
12  there may be a prison sentence coming in this case, and he
13  would like that time to do things like put his wife on his bank
14  account, or put -- I'm sorry, put his wife to where she could
15  receive his VA benefits, and spend as much time with his kids
16  as he can.  That's not the kind of thing that somebody says if
17  what they want to do is double-down on their prior association
18  with a group that's gotten themselves in trouble.  As I said in
19  the motion, there's a -- I'm probably over-reading it, but when
20  the Kansas City Star reporter calls and tells Mr. Chrestman,
21  there's a bunch of people that say this is you in a picture,
22  and that those people have told the FBI is the context that I
23  read the quote in, umm, I mean, this is an opportunity, if the
24  guy hasn't figured it out, for him to leap to his defense or to
25  espouse the language of the Proud Boys or their goals, and he

1    doesn't do any of that.  He's just super polite to the reporter

2    and gets on the phone, and that's because roughly that same

3    time-frame, he is calling Miss Ramsey asking about the

4    possibility of turning himself in.  I mean, I think to the

5    chastened, not emboldened, I think that's the evidence -- those

6    are the circumstances that I think would tend to suggest that

7    that's really where he is personally.

8            THE COURT:  As I read the opposition memorandum, this

9    basically says that the Proud Boys were misled by President

10   Trump.  Is that your client's position?

11           MR. REDMOND:  Misled; I mean, the -- I think that

12   any -- I mean, our contention is that a person who's in the

13   Proud Boys, looking at a situation where the president is

14   openly courting them after a debate or during a debate, is

15   hiring their president Enrique Tarrio to be his Florida

16   Hispanic voter outreach person.  I shouldn't say hire.  I know

17   he's associated with that group.  I don't know if he was paid,

18   but he was proven associated with Trump.  Our point is that

19   these people could clearly have misapprehended that they were

20   going to be given the Capitol because Trump was on their side,

21   which is about 80 percent of what Donald Trump told them at the

22   January 6th rally.

23           THE COURT:  Well, on Page 10 out of 13 of your

24   memorandum, it says, quote, the Capitol Hill rioters were

25   actively misled by, quote, the voice of the state most

1    presently speaking, under quote, former President Donald Trump

2    period.  Trump told the assembled rabble what they must do;

3    they followed his instructions, period, end quote.  Does your

4    client agree with that?

5           MR. REDMOND:  The -- can I have a minute?

6           THE COURT:  Please.

7           MS. RAMSEY:  Your Honor, would you mind giving us that

8    page number again?

9           THE COURT:  Sure, Page 10.

10          MR. REDMOND:  Thank you, Your Honor.

11          THE COURT:  Sure.

12          MR. REDMOND:  Mr. Chrestman says he does agree,

13   because he -- and I asked him about whether I could divulge

14   this, and he said that I can, because he saw police officers

15   waving people into the Capitol when he arrived.

16          THE COURT:  So, he agrees with the statement in its

17   entirety that I just quoted?

18          MR. REDMOND:  That the Proud Boys were actively misled

19   by Donald Trump?

20          THE COURT:  Yes.

21          MR. REDMOND:  Yes.  I mean, he doesn't believe that

22   now.  He understands now that the situation was a lot different

23   than he perceived at the time, 'cause what we're doing there is

24   phrasing the language to freeze it at the time of the event to

25   determine whether it was a defense.

1           THE COURT:  Because he didn't hold that view on

2    January 6th, but he now holds that view, correct?

3           MR. REDMOND:  The opposite.  I'm sorry.  So, our point

4    is that to present the due process defense, you have to

5    consider the state of mind of the actors at the time.  He

6    believed that at the time, based on what -- I can't say he

7    directly heard Donald Trump, I don't know that, but based on

8    what his belief was at the time, that they would be sort of

9    allowed in the Capitol, not that there wouldn't be any police,

10   but at this point, he understands that that's no longer the

11   case.  He sort of reassessed his view of the events of the

12   Capitol.

13          THE COURT:  On Page 2 of your opposition memorandum,

14   says nothing Mr. Chrestman could do now could seriously

15   obstruct this prosecution.  Umm, how about continuing to hide

16   or destroy the items that he was wearing on the date in

17   question?

18          MR. REDMOND:  Umm, I mean, is that serious obstruction

19   at this point?  I mean, if you have the entire world

20   identifying him on those -- those photos on the videos, I mean,

21   I think this is the -- what this portion of the Bail Reform Act

22   is aimed at is people who are threatening witnesses or killing

23   witnesses or creating evidence.  I mean, the -- I don't agree

24   with the idea that the defendant has the duty to leave

25   everything that's either a potential instrumentality of the

1    crime or collaborates certiorari circumstantial evidence at his

2    home.  I don't think he has to do that, and to say that it

3    wasn't in his home is not to say that he obstructed during the

4    investigation.

5          THE COURT:  Is the defendant prepared to stipulate

6    today for purposes of trial that the video evidence that depict

7    his activities accurately do depict his activities?

8          MR. REDMOND:  I think successor counsel would not be

9    thrilled with me if I were to do that.  I think successor

10   counsel would be upset with me if I did such a thing, but

11   that's exactly what the government's representation is.  I

12   mean, they're saying that's him, and a whole bunch of people

13   have said that that's him.

14         THE COURT:  But you're hedging your bets, and

15   reserving your right to contest that evidence, which I

16   understand, but this goes back to whether the defendant ought

17   to be able to have it both ways by concealing evidence.

18         MR. REDMOND:  Your Honor, if this were the case that I

19   was going to continue to defend, I'd go to have a conversation

20   with Mr. Chrestman about the utility of making that decision,

21   but it's just not.

22         THE COURT:  Fair enough.  With regard to the firearm

23   that I understand was exhibited by Mr. Chrestman, not on the

24   date in question at the Capitol, but rather on social media,

25   that hasn't been located either, correct?

1           MR. REDMOND:  That's correct.

2           THE COURT:  So, if Mr. Chrestman were released on the

3    conditions proposed by pretrial services, nothing would stop

4    him from going to get access to that gun?

5           MR. REDMOND:  So, Mr. Chrestman has been advised in no

6    uncertain terms that it's not just a violation of your pretrial

7    release to obtain a firearm, it's also a violation of an

8    independent federal law, because he is now under indictment,

9    and under Tenth Circuit precedent, a complaint counts as an

10   indictment.  So, were he to obtain a firearm, he would -- that

11   -- depending on your guideline calculation, that would then be

12   the most sentence he would potentially be looking at.  You

13   know, some of these counts are misdemeanors.  I can't tell you

14   I can do the exact guideline calculations without any

15   discovery, but I do know how to work a -- a possessing a

16   firearm indictment sentencing guideline calculation, and that

17   would expose him substantially.

18          THE COURT:  I'm not saying it would be a smart idea,

19   but physically, there would be nothing prohibiting or

20   preventing him from getting access to that firearm.

21          MR. REDMOND:  That assumes he owns that firearm.  I'm

22   not sure that's true.  Are we talking about the firearm on

23   social media?  Can I have just a second again?

24          THE COURT:  Yeah.  Sure.

25          MR. REDMOND:  As to the gun on social media, we

1    proffer that that gun is not owned by Mr. Chrestman, but it was

2    somebody --

3          THE COURT:  Say that again; couldn't hear you.

4          MR. REDMOND:  Sorry, Your Honor.  As to the gun in the

5    social media photo, and I'm assuming that everybody is talking

6    about the same thing, 'cause I've not seen this, but we would

7    proffer that is not his firearm.  He does not own it.  The -- I

8    think also the larger point, Your Honor, is that all the time,

9    you release folks with the idea that they have guns in the home

10   but will give them to somebody else.  They could still

11   technically access those guns, but I don't see any greater risk

12   here than Mr. Chrestman would go use those or go access those

13   guns, especially knowing the criminal penalties and the fact

14   that firearms were not instrumentalities of this crime in the

15   first place.

16         THE COURT:  Mr. Redmond, I'm not sure if you have a

17   copy of the complaint in front of you handy, but in

18   Paragraph 28 -- well, strike that.  That is Paragraph 28,

19   excuse me, in Paragraph 28 of the complaint, it states that Mr.

20   Chrestman yelled at one of the Capitol police officers who was

21   attempting to maintain the line, that he said, quote, you

22   shoot, and I'll take your fucking ass out, end quote.  Is the

23   making of that statement captured on the videotape?

24         MR. REDMOND:  Not that I know of, but I don't -- I

25   just don't know the answer to the question.

1          THE COURT:  Is the making of that statement disputed

2     by the defendant for purposes of today's detention hearing?

3          MR. REDMOND:  Not for purposes of today's detention

4     hearing.

5          THE COURT:  Irrespective of what Mr. Chrestman and the

6     other Proud Boys thought that President Trump may have

7     permitted them to do, what am I to make of this statement in

8     the context of expecting a pretrial services officer of our

9     court to go out to his home and supervise, even presumably at

10    times tell him, hey, you can't do this or you can't do that?

11    Is that a fair position to put one of our officers in?

12         MR. REDMOND:  I don't think so, Your Honor, because I

13    mean, it's a terrible fact, but I don't think it's a

14    dispositive fact.  I think if Mr. Chrestman would have come

15    before this court on January 5th, and you could have known what

16    was in his head, I think you would have had to say he was a

17    danger to the community, and I think if nothing had changed

18    since then, I think that's what you'd say today, but I think

19    things have changed.  The Demmler case that we cited, that

20    discussion of whether somebody has been emboldened or

21    chastened, we think this case -- the facts of this case and

22    this defendant come down squarely on the side of somebody who's

23    been chastened.  I don't expect he'd have any problems on

24    supervised release.  I expect he'd follow all the rules.

25         THE COURT:  Thank you, Mr. Redmond.  I appreciate your

1    candor.

2           MR. REDMOND:  Certainly, Your Honor, and I do have

3    answers to a couple of the court's questions.

4           THE COURT:  Go ahead.

5           MR. REDMOND:  Mr. Nordean was detained, and I'm not

6    getting this from a detention order but a media account, but it

7    looks like he was detained because he had a violent history as

8    a street brawler with the Proud Boys, and federal agents seized

9    an unsigned passport of a man formerly married to his wife when

10   they arrested Nordean at his home, suggesting to the government

11   that he is a risk of flight.  And as far as other detention

12   orders, that on -- for -- for cases that relate to the

13   January 6th Capitol riot, I only find two.  Now stuff is behind

14   on Westlaw sometimes.  But the only one, and the first one is a

15   procedural question about whether a defendant can re-visit the

16   detention decision in the Western District of Texas or whether

17   he has to do it in the District of Columbia, but the one that

18   is --

19          THE COURT:  Is that the Grider case that you're

20   referring to?

21          MR. REDMOND:  That was -- yes, Grider, and the other

22   one is Caprioti (ph) out of the Northern District of Illinois,

23   but it appears the defendant there had a long history of

24   threatening people and violating orders of protection, so I'm

25   not sure it's terribly helpful in this case.

1        THE COURT:  Caprioti (ph) did not attend the

2    January 6th event, I don't believe.

3        MR. REDMOND:  I just -- just started scanning this,

4    Your Honor.  That's all I have, Your Honor.  Thank you.

5        THE COURT:  Okay.  Thank you.  Mr. Rask, do you have

6    anything else you wish to present by way of argument based on

7    the questions that I've asked to you and Mr. Redmond?

8        MR. REDMOND:  I would just offer that, you know, some

9    of the -- the information we've provided, we're asking the

10   court to take certain inferences from that information, such as

11   the lack of camouflage, the lack of tactical equipment, and so

12   forth, and certainly, someone could suggest that that would

13   indicate that someone has been chastened as opposed to

14   emboldened.  I don't know what other information we have to

15   necessarily think that that inference is the correct inference

16   to take, and someone could say the government's inference is

17   not the correct one to take either, but I do think recognizing

18   the -- the seriousness of what happened on January 6th as well

19   as the quote that the court identified, and I did confirm with

20   Task Force Officer Kingston that that quote is on the video

21   that was collected from the events at the Capitol on

22   January 6th, those are things that -- that certainly give us

23   great pause, which makes us consider why would someone do those

24   things and then get rid of evidence that connects them to that?

25   That doesn't necessarily suggest someone has been chastened,

1   but rather, trying to distance themselves and still avoid being

2   held accountable for their actions.

3          THE COURT:  Okay.  Thank you, Mr. Rask.  Miss Ramsey

4   or Mr. Redmond, anything further on behalf of Mr. Chrestman?

5          MR. REDMOND:  Your Honor, we have nothing further.

6   Thank you.

7          THE COURT:  Because of the seriousness of this case

8   and the public interests in it, and in an abundance of caution,

9   I'm going to take the matter under advisement today.  That

10   simply means, Mr. Chrestman, that you'll remain in temporary

11   custody until such time as I rule.  That ruling will come out

12   I'm confident within the next few days.  I've not decided how

13   I'm likely to rule the various issues in this case, but do want

14   to comment very generally on the factors that apply here, and

15   how I would anticipate fashioning a release order if I get to

16   that point, 'cause Mr. Chrestman, I want to make sure that

17   there's zero chance later on of you suggesting that you didn't

18   understand the way this works.

19          THE DEFENDANT:  I understand that, sir.

20          THE COURT:  Umm, I'm not going to be in a position

21   where you fall off some crazy act based on something somebody

22   else told you.  Under the statute, the things that I need to

23   consider are four.  First, the nature and circumstances of the

24   offense charged in the case.  The six offenses that are charged

25   against Mr. Chrestman are very serious, and I suspect there

1    will be more serious charges presented by way of indictment

2    within the next couple of weeks.  But regardless of how those

3    charges are currently framed or how they might be reframed in

4    the future, let's be real clear about this.  The charges here

5    involve basically overthrowing the United States Government,

6    and disrupting under our Constitution a peaceful transfer of

7    power after a fully certified election.  That is a very serious

8    matter, and that factor obviously weighs, in my judgment,

9    heavily in favor of detention.  The second factor under the

10   statute, and this is the Bail Reform Act of 1984 as amended, is

11   the nature of the evidence against the defendant.  Mr.

12   Chrestman, you're fortunate to be represented by truly

13   outstanding lawyers, and I hope you appreciate that, and

14   they've been very adjoint here, and they've reserved some

15   things for trial, but at the risk of stating the obvious, the

16   government's evidence against you is very strong, if not

17   overwhelming, and the likelihood of a conviction

18   notwithstanding the due process argument that's been mentioned,

19   in my judgment is near certain.  So, that factor weighs in

20   favor of detention, although under the case law, it's not the

21   strongest factor by any stretch of the imagination.  The third

22   factor under the statute, as we've discussed with counsel, is

23   the history and characteristics of a particular defendant who's

24   before the court.  And regardless of a person's views about the

25   political climate of the last few years, regardless of their

1    views about whether there was election fraud of some sort or a

2    widespread nature, I think everybody in this courtroom,

3    hopefully yourself included, would now realize that what you

4    and the other folks did at the Capitol was -- and I'm not

5    trying to be uncharitable -- still incredibly stupid and

6    dangerous.  And it ultimately left -- led to the death of five

7    individuals, and that's on you and nobody else.  But the

8    characteristics that you present compared to the sort of folks

9    that we typically see in federal court, and as the government

10   has candidly acknowledged, weigh heavily in favor of release.

11   Your criminal history as compared to what we deal with in this

12   courthouse minor.  You have some family members with whom

13   you're close.  I see that you're estranged from others.  You

14   have been employed, although I understand you're unemployed

15   currently.  You're not addicted to drugs.  You're not mentally

16   ill, although some might question that based on the events in

17   question.  But that factor decidedly weighs in favor of

18   release, and under the case law, I think that's probably the

19   most important factor.  The fourth factor is the threat of

20   continued violence or danger to the community.  And I don't

21   know what to make of that.  Certainly, the sort of things that

22   you said to the police officer who was trying to hold back the

23   mob that you were a part of are of great concern to me, and as

24   I was visiting with Mr. Redmond a moment ago, sending out a

25   pretrial services officer from our court, and they are law

1    enforcement officers, to deal with somebody who does such

2    grossly inappropriate things is of concern to me.  But I don't

3    know how to weigh that ultimately, and the question really

4    comes down to how do we set conditions of release that will

5    reasonably assure against flight risk and danger to the

6    community?  Nobody has suggested, and the government

7    essentially concedes that there's a risk of physical flight

8    from the jurisdiction.  I think we know that you're probably

9    going to stay here, and I have every reason to believe you

10   would show up in court in the District of Columbia when you're

11   supposed to, but in my view, sir, the -- the concept of flight

12   risk encompasses whether a particular defendant, given his

13   make-up and his behavior, is reasonably amenable to

14   supervision.  Will that person do what they're told when

15   they're told to do it?  Now, the fact that a police officer

16   told you or gave you reason to believe that you ought to stand

17   back, and then you threatened to kill him is of concern, and if

18   you're shaking your head, look at the complaint, look at the

19   video.  You recall the statement about blowing his fucking ass

20   away, sir?

21          THE DEFENDANT:  Honestly, sir, I don't recall.

22          THE COURT:  All I'm saying is that sort of statement

23   is of concern to me.  I don't know -- I don't profess to know

24   and the government has chosen, I suspect for tactical

25   information, not to share with me about ongoing investigation

1    of the Proud Boys.  I don't know what sort of things they are

2    cooking up, or whether they completely ceased their activities.

3    Maybe they're as chastened as Mr. Redmond thinks you are.  But

4    I don't know that, and I don't know what sort of things that

5    you might do with them, and whether there might be other

6    efforts to overthrow the United States Government.  So, how we

7    address that in terms of conditions, I want to think about

8    before I make a decision.  Now, ultimately, I need to make a

9    finding one way or the other as to whether the government has

10   established flight risk as I've defined it by what's known as a

11   preponderance of the evidence.  That's a very low standard, and

12   it's a standard that applies at the trial of a civil case.

13   It's much lower than beyond a reasonable doubt that applies at

14   the trial of a criminal case.  I also need to find, or make a

15   finding one way or the other as to whether there is clear and

16   convincing evidence that you're a danger to the community or a

17   danger of obstructing justice.  I think those are all close

18   calls on this record.  Now, sir, if I decide ultimately to

19   release you, as I perhaps implied to questions I was posing of

20   Mr. Rask a few minutes ago, those conditions will be more

21   stringent than those preliminarily recommended by the pretrial

22   services office.  In addition to all of the conditions that

23   they have proposed, I'm fairly confident that at a minimum, it

24   would contain an absolute ban on any travel unless approved in

25   advance by the pretrial services.  It's also likely to include

1    a home detention provision which would basically require you to

2    get advance permission from pretrial services to leave your

3    home for any reason, whether to meet with a lawyer, go to the

4    doctor, or otherwise.  And it would also include, I'm confident

5    if I go that route, electronic monitoring that you'll get to

6    contribute to the cost of.  And finally to provide any -- to

7    provide incentive for you not to violate the conditions of

8    release, any release order likely would require you to cough up

9    and post a cash bond with the court in the amount of $10,000

10   that you told me last week that you've got in your safe at

11   home.  Now, if those conditions of release are set, and I'm not

12   decided that they will be, but if they are set in that fashion,

13   sir, I would imagine that your supervision would be conducted

14   on what's known as a courtesy basis by pretrial services

15   officers in this district, and they would be reporting to a

16   magistrate judge or a district judge in the District of

17   Columbia.  If there were a violation of those conditions of

18   release, whether it be based on your leaving your home without

19   permission or otherwise, that would likely be reported to me

20   within a matter of hours, no more than a couple of days.  And

21   at that point, you'll either be brought back before me or put

22   on a transport within a matter of weeks back to the District of

23   Columbia for further proceedings.  So, if it goes that route, I

24   want to be crystal clear about the way this works.  If you ever

25   have questions about what you are permitted to do or not

1   permitted to do under the order, I strongly suggest that you

2   call both of your lawyers or at least one of them, they're both

3   good, very good, and also call your supervising pretrial

4   services officer, because if you guess wrong or simply assume

5   that you should be able to be permitted to do something, or

6   because you think some member of the Proud Boys or the former

7   president tells you, you should be able to do something, that's

8   not going to cut it with this court.  You understand what I'm

9   telling you, sir?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Do you have any questions about what I've

12   just told you?

13          THE DEFENDANT:  Not at the moment, Your Honor.

14          THE COURT:  Very well.  Unless there's anything else

15   on behalf of either side, we stand adjourned.  Mr. Rask,

16   anything else?

17          MR. RASK:  Judge, as far as getting you that other

18   information, would you like something to be filed or submitted

19   informally to chambers?

20          THE COURT:  If you could e-mail to chambers, that

21   would be fine.  Just make sure it's copied to Mr. Redmond and

22   Miss Ramsey as well.

23          MR. RASK:  Yes, Your Honor.

24          THE COURT:  Okay.  Counsel on this side, anything

25   else?

1          MS. RAMSEY:  No, Your Honor.

2          MR. RASK:  Oh, I guess the date of the prelim, Judge.

3          THE COURT:  I'm sorry, I couldn't hear you.

4          MR. RASK:  The date of the preliminary hearing,

5    February 25th work for the court?

6          THE COURT:  Well, are we talking about a preliminary

7    hearing here then?  How do you want to do this?  Have the

8    lawyers visited about where the preliminary hearing would be

9    held if one is necessary?  Well, let me back up a little bit.

10   If the defendant is released, and I think this has been shared

11   via e-mail previously, but the next court appearance by Zoom in

12   front of the judge in the District of Columbia would be

13   February 26th, 2021, at 1:00 PM eastern, and that would be

14   conducted by Zoom.  I believe the Zoom invitation has all ready

15   been sent tentatively anticipating release, but without

16   presuming that, that would be the case, umm, Mr. Rask, at this

17   point, you don't know whether or on what date the charges would

18   be presented to a grand jury in DC, is that correct?

19         MR. RASK:  Correct.  I -- I think that we would know

20   around the 25th, Your Honor.

21         THE COURT:  So, does it make sense to set the

22   preliminary, if one is necessary?  For the benefit of the

23   people in the courtroom, a preliminary hearing would not be

24   held if the grand jury returns an indictment.  Does it make

25   sense to set it on the 26th then?

1          MR. RASK:  I think on or after the 25th, we should

2     know, Your Honor.

3          THE COURT:  Okay.  Umm, is the defendant prepared to

4     extend the deadline for holding the preliminary?  I hate to

5     have people preparing for a hearing that might not be necessary

6     but --

7          MS. RAMSEY:  Yes, we are, Your Honor.

8          THE COURT:  Sarah, what's the schedule look like the

9     early part of that following week?

10          MS. SPEGAL:  The 26th or the week after that?

11          THE COURT:  The week after that?

12          MS. SPEGAL:  So, that would be the week of March 1st.

13          THE COURT:  Counsel, what if we were to set the -- the

14     preliminary hearing on Monday of the following week?  That's

15     what, the specific date?

16          MS. SPEGAL:  March 1st.

17          THE COURT:  March 1st.  Okay.  March 1st at 9 o'clock.

18     Does that work for everybody?

19          MS. RAMSEY:  Yes, Your Honor.

20          MR. RASK:  Yes, Your Honor.

21          MS. RAMSEY:  Your Honor, could we set it at 10

22     o'clock?  Mr. Redmond's unavailable at 9.

23          THE COURT:  Want to sleep in?  Yes, 10 o'clock will

24     work.  Okay.  Anything else for the good of the order from

25     either side?

1          MR. RASK:  No, Your Honor.  Thank you.

2          MS. RAMSEY:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you, everyone.  I appreciate the

4     excellent presentations by all counsel.  We are adjourned.  My

5     courtroom deputy has raised a valid point.  Does the defendant

6     consent to the March 1st preliminary hearing, if it's held,

7     being conducted by Zoom, or do you insist on it being done

8     live?

9          MS. RAMSEY:  Yes, Your Honor, by Zoom is fine.

10          THE COURT:  Very well.  March 1st, '10 o'clock by

11     Zoom.  Thank you, everybody.

12          (Whereupon court recessed.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4

5       I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official reporter

7    of the United States District Court for the District of Kansas,

8    do hereby certify that as such official reporter, I was present

9    at and reported in machine shorthand the above and foregoing

10   proceedings.

11      I further certify that the foregoing transcript, consisting

12   of 42 typewritten pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15      SIGNED March 5, 2021.

16

17                       S/_____

18                       Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25